**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **KATHLEEN Y. GILMOUR,** | ) | |
| | ) | **No. 14 CV 10493** |
| **Claimant,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Magistrate Judge Michael T. Mason** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of the U.S. Social** | ) | |
| **Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Michael T. Mason, United States Magistrate Judge:

Claimant Kathleen Gilmour ("Claimant") seeks judicial review under 42 U.S.C. §
405(g) of a final decision of Defendant Commissioner of the Social Security
Administration ("SSA") denying her claim for Social Security Disability Insurance
Benefits ("DIB") under Title II of the Social Security Act ("the Act"). *See* 42 U.S.C. §
423. The parties have consented to the jurisdiction of the United States Magistrate
Judge pursuant to 28 U.S.C. § 636(c). For the reasons that follow, Claimant's motion
for summary judgment [11] is granted and the Commissioner's motion is denied [20].

### I.      BACKGROUND

**A.      Procedural History**

Claimant filed a Title 2 DIB application on April 7, 2011 alleging an onset date of
April 1, 2003 due to depression, chronic pain, fatigue, Fibromyalgia ("FMS"), and loss of
cognition. (R. 271-82.) The application was denied initially on June 8, 2011 and upon
reconsideration on October 18, 2011. (R. 128-29.) After both denials, Claimant filed a

hearing request on December 9, 2011 pursuant to 20 C.F.R. § 404.929 *et seq.* which was scheduled on January 14, 2013 before an Administrative Law Judge ("ALJ").  (R. 43-67, 149-50.)  Claimant did not offer testimony at that hearing and another hearing was scheduled on June 5, 2013.  (R. 68-127.)  Claimant appeared for her hearing along with her representative.  (R. 43-127.)  A Vocational Expert ("VE"), Medical Expert ("ME"), and Psychological Expert ("PE") were also present to offer her testimony.  (*Id.*)  On June 28, 2013, the ALJ issued a written determination finding Claimant not disabled and denying her DIB application.  (R. 15-36.)  Claimant sought review by the Appeals Council ("AC"), which was granted.  On November 25, 2014, and after a review of the record, the AC issued a written decision upholding the ALJ's findings.  (R. 4-6.)  The AC adopted the ALJ's findings at every step of the sequential evaluation.  (R. 5.)

## B.    Medical Evidence

Claimant's record contains medical evidence from West Suburban Hospital Medical Center that date back to May 9, 1995.  (R. 1137.)  She complained of pain in her lower back and legs.  (*Id.*)  The attending physician, Dr. Max Harris, opined that Claimant suffered from FMS.  (*Id.*)  Claimant next visited Dr. Harris on March 13, 1997 due to continuing pain in her shoulder and right arm.  (R. 1143.)  A physical examination returned mostly normal results, as she had normal range of motion, flexion, and extension in her arm and shoulders.  (*Id.*)  Claimant continued to visit Dr. Harris through October 6, 2003.  (R. 397.)  Throughout his treatment of Claimant, Dr. Harris continued to diagnose Claimant with FMS.  (R. 1154.)

Claimant continued to have pain and flare-ups and began acupuncture therapy with Dr. Jeffrey Oken as early as 2001.  (R. 1167.)  Records indicate that Claimant first

visited the Marianjoy Medical Group ("Marianjoy") on July 26, 2002 due to radiating pain in her left arm.  (R. 353.)  Claimant was treated mainly by Dr. Oken.  (*Id.*)  A physical examination indicated that she had limited abduction in the left shoulder.  (*Id.*)  Her grip strength on the left side was at 20 pounds and 60 pounds on the right side.  (*Id.*)  She was advised to continue her prescribed medication regimen, which included Flexeril and Vicodin.  (*Id.*)

An MRI of her left shoulder taken on July 22, 2002 indicated small joint effusion. (R. 491.)  An MRI of her cervical spine on August 2, 2002 found no significant abnormalities in her spine.  (R. 490.)  On September 10, 2002, Claimant reported a decreased range of motion in her left shoulder.  (R. 593.)  She was prescribed an aggressive anti-inflammatory therapy for the shoulder.  (*Id.*)  On April 24, 2003, Claimant reported feeling "considerably better."  (R. 399.)

On August 27, 2002, Claimant visited the Hinsdale Orthopaedic Associates ("Hinsdale") at the referral of Dr. Oken for treatment of her progressive shoulder pain. (R. 370.)  She was given an injection in her shoulder and a brace for Carpal Tunnel Syndrome.  (*Id.*)  She was also prescribed Vicodin to ease her pain.  (*Id.*)  She began physical therapy on September 5, 2002.  (R. 372.)  Claimant's progress during physical therapy fluctuated as she reported improvements on some days and increased pain in others.  (R. 372-388.)  During her later visits in October 2003, Claimant continued to report burning and tightening of her shoulders and arm pains.  (R. 387.)  Her supervised physical therapy ended on October 15, 2003, and she was to begin a home exercise program.  (R. 387-88.)

Claimant visited Marianjoy again on February 20, 2003. (R. 351.) She indicated that her pain worsened in the previous weeks. (*Id.*) She was diagnosed with FMS and "frozen shoulder." (R. 352.) On March 27, 2003, Claimant returned to Marianjoy and underwent a medical acupuncture procedure on her cervical spine. (R. 350.) It was noted that she tolerated the procedure well and she was advised to return to continue the procedure. (*Id.*) On April 30, 2003, Claimant had an EMG performed at Marianjoy. (R. 348.) After a review of the EMG, Dr. Oken opined that Claimant had radicular pain syndrome, "not manifesting on EMG, but causing her significant pain," and suggested that she continue physical therapy. (R. 349.)

Claimant first visited the Chiropractic Healing Center ("CHC") on July 7, 2005 to seek treatment for her spine. (R. 852.) The treating physician noted that she had decreased cervical spine rotation and suggested that she return for chiropractic therapy. (*Id.*) Claimant received near weekly therapy sessions at CHC through May 5, 2011. (R. 1021.) Treatment notes from CHC indicate that Claimant's progress fluctuated and there were certain days where her pain was much more severe than other days. (R. 872, 885, 900, 965.) She would also present with new issues on occasion, such as new pain in her neck and thighs. (R. 913, 946.) Generally, the treating practitioner considered her prognosis to be "good." (R. 873, 913, 1008.)

Medical records show that Claimant was treated by Dr. Yolanda Co since 2003 for FMS and depression. (R. 459.) The treatment notes indicate that she provided Claimant with routine checkups and examinations and regularly prescribed Vicodin. (R. 450-460.)

Since April 25, 2009, Claimant has seen Dr. Keri Topouzian, who specializes in thyroid disorders. (R. 547.) During her April 25, 2009 visit, Dr. Topouzian noted that Claimant complained of FMS, chronic fatigue, and "brain fog." (*Id.*) Dr. Topouzian noted that Claimant suffered from a hormone imbalance and suggested additional diagnostic tests. (R. 566.) Claimant continued to visit Dr. Topouzian through April 8, 2011. (R. 620-21.) Much like the findings at CHC, Claimant's progress fluctuated greatly. On May 20, 2009, she was diagnosed not only with FMS but with Lyme Disease. (R. 564.) Claimant continued to visit Dr. Topouzian for help in treating her FMS, fatigue, and Hashimoto's disease, a form of thyroiditis. (R. 554, 550, 552.) Claimant continued to see Dr. Topouzian for her various conditions including bloating, leg pain, and sinus infections. (R. 535, 648.) On January 21, 2010, Claimant reported feeling depressed and suffering from crying spells lasting five days. (R. 529.) Dr. Topouzian diagnosed her with seasonal affective disorder and depression. (*Id.*)

On March 3, 2010, Dr. Gail Rosseau of the Northshore University Medical Group ("Northshore") conducted a neurological evaluation due to Claimant's complaints of head pain. (R. 691.) He reviewed an MRI of Claimant's brain and found that she had a frontal tumor that she believed was meningioma, a non-cancerous tumor. (*Id.*) An April 23, 2011 neurological evaluation yielded no change in Claimant's chronic mild headaches. (R. 689.) Dr. Rosseau noted that Claimant had good power in all extremities, a normal gait, and normal balance. (*Id.*)

On June 11, 2012, Claimant returned to Marianjoy and underwent a physical evaluation. (R. 1044.) After the evaluation, Claimant was found to have mobility dysfunction secondary to FMS, depression, chronic pain syndrome, and myofascial pain

syndrome.  (R. 1048.)  On June 25, 2012, she entered into a comprehensive pain program at Marianjoy, which included treatment in the form of physical therapy, psychology, biofeedback and education.  (R. 1093-94.)  Her progress throughout the program fluctuated, as did her symptoms.  On June 29, 2012, she reported feeling increased morning pain and was almost unable to return to therapy.  (R. 1062.)  On July 16, 2012, she reported feeling much better but that her pain level is at an eight out of ten.  (R. 1077.)  On July 25, 2012, Claimant stated that she had increased pain in her upper back region and increased neck tightness.  (R. 1088.)  She was given trigger point injections to treat her myofascial pain syndrome.  (R. 1090.)  On August 1, 2012, she was discharged from pain management therapy.  (R. 1100.)  She was prescribed pain medication and advised to do aqua-therapy two times a week for eight weeks.  (*Id.*)

On January 4, 2013, Melanie Weller, a clinical counselor, wrote a statement regarding her treatment of Claimant's mental impairments.  (R. 1122-1123.)  Ms. Weller indicated that she had been treating Claimant since March 24, 2011 for her depression and anxiety, both of which she opined were related to her FMS.  (R. 1122.)  She further indicated that Claimant was able to detox off of her pain medication.  (*Id.*)  However, Ms. Weller opined that Claimant's pain could still be chronic at times and less so at other times.  (*Id.*)  She further stated that "her intermittent sleep/pain problems leave her unable to function well during mornings and sometimes whole days."  (*Id.*)  Ms. Weller stated that Claimant's depression was in part due to her inability to return to a normal life because of her pain.  (*Id.*)  As a result, Ms. Weller noted that she "d[oes] not see how [Claimant] can hold a job with any regularity."  (*Id.*)

**C.      Claimant's Testimony**

Claimant was present at both the January 14, 2013 and June 5, 2013 hearing, but only offered testimony on June 5, 2013.  (R. 95-127.)  She testified that from the relevant disability period between 2003 through 2005, she did not work.  (R. 95-96.)  Claimant further testified that she had been treated for depressive episodes in the 1980's and sought treatment from 35 to 50 doctors while working.  (R. 96.)  She returned to school during the spring of 2004 and saw both Dr. Harris, her rheumatologist, and Dr. Cullany, a treating physician.  (R. 100, 103.)  Claimant explained that she visited Dr. Harris once to twice a year, and he would refer her to Dr. Cullany, who treated her for her FMS.  (*Id.*)  Dr. Cullany prescribed Lexapro for her depression but she testified that she felt "terrible" while taking it.  (R. 101.)  Claimant further testified that Dr. Cullany managed her psychotropic medications and diagnosed her with Asthenia, a form of weakness brought on by her antidepressants.  (*Id.*)  She was later prescribed Wellbutrin, which she testified helped her to feel better.  (R. 102.)

Claimant testified that while in school, she received special accommodations such as having a special table and chair in the classroom, taking exams in special computer centers designated for disabled individuals, having a note-taker to assist her in class, and not being penalized for absenteeism.  (R. 104-05.)  Claimant stated that she was frequently absent, usually once a week.  (R. 105.)  She testified that she was often sick with various viral infections.  (R. 106.)

Claimant stated that she was prescribed several medications for her FMS, including Vicodin.  (R. 109.)  She told the ALJ that the combination of the medications caused her to feel sedated, she was unable to think clearly or drive, and she had dry

mouth.  (R. 110.)  Though she reported these side effects to her doctors, Claimant stated that she went along with it because she felt that she did not have a choice.  (*Id.*)

Claimant lives with her husband and two teenage children.  (R. 111.)  She testified that she did not complete any household chores because of the pain.  (*Id.*)  She further testified that when she stopped working, she started to attend church and participate in volunteer activities.  (R. 113.)  However, she stated that she had to stop performing such activities because she had fatigue, and she felt that her cognitive abilities were failing.  (*Id.*)  She testified that her social life gradually dissipated because while she made plans, she was never able to see them through due to excessive fatigue and pain.  (R. 114.)  She could walk to the end of the block and stand for about five to ten minutes before the pain started.  (R. 115.)

Claimant stated that in her former job, she had to drive frequently between offices.  (R. 118.)  She also walked around the office to check on other employees.  (*Id.*)

## D.    ME Testimony

As an initial matter, the ME testified that Claimant had the impairment of capsulitis of the shoulder, a condition involving the inflammation of the joint capsule.  (R. 73.)  The ME also noted that an August 2, 2002 MRI of Claimant's cervical spine showed a more significant abnormality.  (*Id.*)  The ME further testified that Claimant has the impairment of FMS which was originally documented on August 27, 2002.  (R. 74.)  The ME opined that these impairments have more than a minimal effect on her ability to perform work-related activities.  (R. 75.)  However, the ME did not believe that the impairments, whether considered singularly or in combination, would meet or equal in severity any of the impairments from the listing.  (*Id.*)  Taking into account her

impairments and medication, the ME found Claimant capable of light work. (R. 76.)

The ME found Claimant able to lift and carry 20 pounds occasionally and 10 pounds

frequently. (*Id.*) She can also sit, stand, and walk for about two hours at a time in an

eight-hour workday. (*Id.*) The ME found no further restrictions in the upper right

extremities or her hands. (R. 77.)

**E.    PE Testimony**

A PE testified at the hearing and first noted the lack of mental health records

indicating a mental impairment. (R. 93.) The PE noted instances in which Claimant

discussed feeling anxious or depressed with her various doctors. (*Id.*) The PE noted

she was prescribed Trazodone, an antidepressant, but there was otherwise no

indication she actually took the medication. (*Id.*)

**F.    VE Testimony**

The VE initially determined that Claimant's past relevant work was that of a

supervisor, a skilled position varying between light to sedentary. (R. 121-22.)

According to the VE, the position required walking and standing for two to three hours,

as well as sitting four to five hours. (R. 122.) The VE also found that Claimant's past

relevant work included that of a director of out-patient services, a skilled position

ranging between light and sedentary. (R. 123.) The VE opined that based upon the

ME's RFC assessment, Claimant has the capacity to perform both of her previous jobs

as they are performed generally in the national economy. (R. 123-24.)

Claimant's attorney then asked the VE whether an individual with the same RFC,

but could only walk or stand for up to two hours in an eight-hour workday, sit for six

hours, lift up to ten pounds occasionally and less frequently, and could have limited

interaction with coworkers, supervisor, and the public, would be able to perform Claimant's past relevant work.  (R. 124.)  The VE stated that the positions were skilled and therefore an individual with such limitations would be unable to perform duties of those positions.  (*Id.*)  Claimant's attorney then asked whether an individual who had the same RFC but was absent three or more days a month would be able to perform the jobs. (*Id.*)  The VE answered that an individual with frequent absenteeism would not be capable of maintaining her employment.  (*Id.*)

## G.    ALJ Determination

On June 28, 2013, the ALJ issued a written opinion denying Claimant's DIB application.  (R. 15-36.)  As an initial matter, the ALJ determined that Claimant met the insured status requirement of the Act through December 31, 2005.  (R. 20.)  At step one, the ALJ found that Claimant has not engaged in Substantial Gainful Activity ("SGA") since her alleged onset date of April 1, 2003.  (R. 21.)  At step two, the ALJ found that Claimant has at least a medically determinable severe impairment, though he did not specify which impairment he believed to be severe.  (*Id.*)  At step three, the ALJ determined that Claimant's impairment did not meet or medically equal the severity of the listed impairments as found in 20 C.F.R. Part 404, Subpart P, App'x 1.  (R. 25.)  Before step four, the ALJ found that Claimant had the Residual Functional Capacity ("RFC") to perform light work on a sustained basis.  (R. 26.)  At step four, the ALJ determined that Claimant is capable of performing past relevant work as a director of outpatient services and healthcare facility administrator.  (R. 23.)  The ALJ determined that even if Claimant were limited to sedentary exertion, she would retain the capacity to

meet the demands of her past relevant work as it is generally performed in the national economy.  (R. 34-35.)

## II.    LEGAL ANALYSIS

### A.    Standard of Review

Because the AC denied review on May 29, 2014, the ALJ's findings constitute the final decision of the agency.  (R. 1-3); *see Herron v. Shalala*, 19 F.3d 329, 332 (7th Cir. 1994).  The findings of the ALJ as to any fact, if supported by substantial evidence, shall be conclusive.  42 U.S.C. § 405(g); *see also Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002); 42 U.S.C. § 1383 ("The final determination of the Commissioner after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title.")  Although the court affords great deference to the ALJ's determination, it must do more than merely rubber stamp the ALJ's decision.  *See Griffith v. Sullivan*, 916 F.2d 715 (7th Cir. 1990) citing *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986).  In order to affirm the ALJ's decision, the court must find the decision to be supported by substantial evidence on the record as a whole, and must take into account whatever in the record fairly detracts from its weight.  *See Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 488 (1951).  Substantial evidence is more than a mere scintilla; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *See Kepple v. Massanari,* 268 F.3d 513 (7th Cir. 2001) citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

The court may not displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations.  *See Skinner v. Astrue*, 478 F.3d 836,

841 (7th Cir. 2007). Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that determination falls upon the ALJ, not the courts. *See Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990). An ALJ must articulate her analysis by building an accurate and logical bridge from the evidence to her conclusions, so that the court may afford the claimant meaningful review of the ALJ's ultimate findings. *See Pepper v. Colvin*, 712 F.3d 351 (7th Cir. 2013). It is not enough that the record contains evidence to support the ALJ's decision; the court must remand if the ALJ does not rationally and sufficiently articulate the grounds for that decision. (*Id.*)

## B.      Analysis under the Social Security Act

To qualify for Social Security Title II DIB, a claimant must be under a disability within the meaning of the Act. *See* 42 U.S.C. § 423(a)(1)(E). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also Barnhart v. Walton*, 535 U.S. 212, 217–22 (2002). Pursuant to the Act, Claimant is disabled only if her physical or mental impairments are of such severity that she is unable to do her previous work and cannot, when "considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which she lives, or whether a specific job vacancy exists for her, or whether she would be hired if she applied for work." 42 U.S.C. § 423(d)(2)(A). Another agency requirement to receive disability insurance

benefits is that Claimant must show she was disabled on or before the date her insured status expired. *See* 20 C.F.R. § 404.130 for definition of insured status; *see also Stevenson v. Chater*, 105 F.3d 1151, 1154 (7th Cir. 1997).

Under the authority of the Act, the SSA has established a five-step sequential evaluation process for determining whether Claimant is disabled. *See* 20 C.F.R. § 404.1520(a). This five-step sequential evaluation process requires the ALJ to inquire:

1.     Is Claimant presently engaging SGA? *See* 20 C.F.R. § 404.1572 *et seq.*

2.     Does Claimant have a severe medically determinable physical or mental impairment that interferes with work and is expected to last at least 12 months?

3.     Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? *See* 20 C.F.R. § Pt. 404, Subpt. I, App. 1.

4.     Is Claimant unable to perform her former occupation?

5.     Is Claimant unable to perform any other work?

20 C.F.R. § 404.1520(a)(4); *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

A negative answer at any point, other than step three, ends the inquiry and leads to a determination that Claimant is not disabled. *See Zalewski v. Heckler*, 760 F.2d 160, 162 n. 2 (7th Cir. 1985). Claimant has the burden of establishing steps one through four. At step five, the burden shifts to the Commissioner to establish that Claimant is capable of performing work. *See Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000).

### III.     DISCUSSION

Claimant proffers three arguments to contest the ALJ's disability determination. First, she argues that the ALJ erred in finding she had the RFC to meet the demands of

her past relevant work. (Pl. Mot. at 9-10.) Claimant next argues that the ALJ's credibility determination was insufficient. (Pl. Mot. at 10-14.) Finally, Claimant contends that the ALJ erred in failing to consider her manipulative limitations in assessing her RFC. (Pl. Mot. at 14-15.) The Court will address the issue of her past relevant work and manipulative limitations first, as they relate to Claimant's RFC. Then the Court will address the ALJ's credibility determination.

## A.    Claimant's Fibromyalgia

Claimant's challenge to the ALJ's RFC and his conclusion that Claimant could work her previous jobs is twofold. She argues first that the ALJ erred in failing to consider the non-exertional limitations that her FMS would have had on her ability to work. (Pl. Mot. at 9-10.) Next, she argues that the ALJ's RFC assessment is flawed because he did not give adequate consideration to her manipulative limitations. (R. 14-15.) Though Claimant focuses on her non-exertional and manipulative limitations in challenging the ALJ's decision, the Court finds that the ALJ's error lies in his failure to consider all the relevant evidence in rendering the overall RFC assessment.

In his written decision, the ALJ determined that Claimant had the RFC to perform a range of light work on a sustained basis during her relevant disability period. (R. 26.) At step four, "an ALJ must examine the claimant's [RFC]—that is, the types of things [s]he can still do physically—to determine whether [s]he can perform h[er] past relevant work, 20 C.F.R. § 404.1520(a)(4)(iv), or, failing that, whether the claimant can make an adjustment to other work given h[er] age, education, and work experience, 20 C.F.R. § 404.1520(a)(4)(v)." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008). A claimant's RFC is "the most [the claimant] can still do despite her limitations," and the ALJ

determines a claimant's RFC based on all the claimant's impairments and all the relevant evidence in the record. 20 C.F.R. §§ 404.1545(a), 416.945(a); *see also Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009).

Here, the ALJ determined that Claimant had FMS. Fibromyalgia is "a disorder characterized by widespread musculoskeletal pain accompanied by fatigue, sleep, memory and mood issues. Researchers believe that fibromyalgia amplifies painful sensations by affecting the way your brain processes pain signals," and that it sometimes follows "significant psychological stress." *Williams v. Colvin,* 757 F.3d 610, 612 (7th Cir. 2014) (quoting Mayo Clinic, "Diseases and Conditions: Fibromyalgia," www.mayoclinic.org/diseases-conditions/fibromyalgia/basics/definition/con-20019243 (visited July 25, 2016)). While he acknowledged her FMS, the ALJ determined that Claimant was limited by her FMS but did not "credit" her allegations regarding the frequency and duration of intense symptoms associated by her FMS.

In making this determination, the ALJ reviewed the medical record and gave several reasons. The ALJ noted the treatment notes of Dr. Co, who was Claimant's primary care physician from 2003 through 2006. The ALJ indicated that the treatment notes did not reference any limitations to Claimant's functioning, but "always identified [FMS] as a condition being treated." (R. 26.) He referenced Dr. Co's findings regarding Claimant's ability to return to school and her physical therapy treatments. (*Id.*) He also noted a treatment note from September 11, 2003, in which it was noted that her FMS was improved despite increased stress from family. (R. 26, 440.) However, a reasonable reading of the notes indicates that Claimant was only reported to have improvement while on medications such as Baclofen, Vicodin, and Trazodone for her

FMS, pain, and sleep deprivation. (R. 393.) The ALJ also neglected to mention that less than a month later, during a visit with Dr. Harris on October 2, 2003, Claimant was experiencing increased symptoms in her shoulders, upper back muscles, and her neck. (R. 397.) Dr. Harris opined that Claimant's physical health was "affected in a more obvious way" because of her family situation and the stress from it. (*Id.*) Though the Commissioner argues that none of Claimant's treating sources opined about her stress level, Dr. Harris's note clearly shows that he did have an opinion regarding her stress.

Medical records also show that Claimant had been receiving physical therapy from August 27, 2002 through October 15, 2003. (R. 370-88.) Claimant's progress during physical therapy fluctuated throughout this period as she reported improvements on some days and increased pain in others. During her later visits in October 2003, Claimant continued to report burning and tightening of her shoulders and arm pains. (R. 387.) The ALJ did not consider this line of evidence that seems to suggest Claimant's continued difficulties with FMS and instead supported his finding by focusing on only the parts of the record that showed improvement. When determining a claimant's RFC, an ALJ may not ignore an entire line of evidence that is contrary to his findings, *Henderson v. Apfel*, 179 F.3d 507, 514 (7th Cir.1999), and must articulate at some minimal level his analysis of the evidence to permit an informed review. *See Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001); *Villano v. Astrue*, 556 F.3d 558, 563 (7th Cir.2009); *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016).

The ALJ also appears to have used evidence of Claimant's performance in school to determine that she was not as limited by her FMS as she alleged. In his decision, the ALJ referenced a treatment note from August 24, 2004 in which the

attending physician noted that Claimant was enrolled in college courses and got a "straight-A report card."  (R. 27, 391.)  But it was unreasonable for the ALJ to use Claimant's schooling as evidence that she was not disabled by her FMS.  *See Scrogham v. Colvin*, 765 F.3d 685, 700 (7th Cir. 2014) *citing Clifford*, 227 F.3d 863 at 872 ([T]o the extent that the ALJ relied on evidence of Mr. Scrogham's daily activities to determine that he was capable of returning to work, those activities do not appear to us to constitute "substantial evidence that [he] does not suffer disabling pain," and they "do not establish that [he] is capable of engaging in substantial physical activity.")

The ALJ also cited the portion of the treatment notes that state that "she has gotten very good at handling a lot of issues regarding her [FMS]."  (*Id.*)  Once again, the ALJ was selective in his use of evidence, as the same treatment note also reported that Claimant took 30 mg of Codeine, a narcotic pain killer, daily to treat her symptoms.  (R. 391.)  The Court does not mean to say that her medication regimen determines her disability, but that her reliance on narcotic pain killers and regular physical therapy to cope with her pain indicates a significant level of limitation that the ALJ failed to address in his decision.  *See Carradine v. Barnhart*, 360 F.3d 751, 755 (7th Cir. 2004) ("[w]hat is significant is the improbability that Carradine would have undergone the pain-treatment procedures that she did, which included not only heavy doses of strong drugs such as Vicodin, Toradol, Demerol, and even morphine, but also the surgical implantation in her spine of a catheter and a spinal-cord stimulator, merely in order to strengthen the credibility of her complaints of pain and so increase her chances of obtaining disability benefits.)  The ALJ was not permitted to "cherry-pick" from mixed results to support a denial of benefits.  *See Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Denton v.*

*Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Because the ALJ did not consider all of the evidence on record, remand is required for further explanation.

Claimant's argument regarding her inability to perform her past relevant jobs due to the stress level requires the Court to infer that the positions that the VE and ALJ assigned are stressful in nature. While this may be true, and while the Court acknowledges that Dr. Harris did opine that Claimant's stress is correlated to her physical health, neither the ALJ nor the VE addressed the amount of stress present at Claimant's former positions, and the Court will not make such an inference. However, "even if a claimant has the RFC to meet the exertional requirements for [light] work, the regulations acknowledge that 'non-exertional' limitations—such as 'mental, sensory, or skin impairments' or postural and manipulative impairments or environmental restrictions'—may make application of the Guidelines improper." *See* Appendix 2 § 200.00(e); *see also Cannon v. Harris*, 651 F.2d 513, 517 (7th Cir. 1981); *Smith v. Schweiker*, 735 F.2d 267, 271 (7th Cir. 1984). Here, the ALJ may have determined Claimant capable of performing light work, but because of his failure to consider the whole medical record, including evidence suggesting disability, the Court cannot adopt the ALJ's decision.

Furthermore, with regard to Claimant's manipulative limitations, the Commissioner argues that Claimant failed to identify any medical opinion limiting use of her hands. (Def. Resp. at 6.) But while treating physicians did not necessarily limit the use of her hands, medical records clearly demonstrate Claimant's issues in dealing with her hands, such as nerve pain and tingling in her hands. (R. 438, 442.) On remand,

the ALJ shall consider all of Claimant's limitations, even those not considered severe, in rendering his decision. *See Simila*, 573 F.3d 503 at 513.

## C. Credibility Determination

Finally, Claimant argues that the ALJ erred in rendering her adverse credibility determination. Since the ALJ issued his decision in this case, the SSA has issued new guidance on how the agency assesses the effects of a claimant's alleged symptoms: SSR 96-7p and its focus on "credibility" has been superseded by SSR 16-3p in order to "clarify that subjective symptom evaluation is not an examination of the individual's character." *See* SSR 16-3p, 2016 WL 1119029, at *1. As SSR 16-3p is simply a clarification the Administration's interpretation of the existing law, rather than a change to it, it can be applied to Claimant's case. *See Qualls v. Colvin*, No. 14 CV 2526, 2016 WL 1392320, at *6 (N.D. Ill. Apr. 8, 2016); *Hagberg v. Colvin*, No. 14 C 887, 2016 WL 1660493, at *6 (N.D. Ill. Apr. 27, 2016). Because the court deems it necessary for the ALJ to remedy the previously discussed issues with the RFC assessment, on remand the ALJ should conduct a symptoms evaluation pursuant to the new SSR 16-3p.

The ALJ referenced Claimant's testimony at the hearing that her FMS is exacerbated by stress and her inability to control her stress level. (R. 30.) The ALJ also noted Claimant's testimony that her treating physician, Dr. Reynes, has told her that "there is no question that she is disabled." (*Id.*) However, the ALJ's ultimate decision was to not credit Claimant's allegations regarding the frequency and duration of intense symptoms associated with her established impairments. (*Id.*) Because Claimant takes issue with the ALJ's treatment of her testimony, on remand, the ALJ

shall take guidance from the new regulation, which describes a two-step process for evaluating a claimant's own description of her impairments.

First, the ALJ "must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms, such as pain." SSR 16-3p, at *2; *see also* 20 C.F.R. § 404.1529. "Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce the individual's symptoms is established, [the agency] evaluate[s] the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities...." SSR 16-3p, at *2. In evaluating a claimant's symptoms, "an ALJ must consider several factors, including the claimant's daily activities, her level of pain or symptoms, aggravating factors, medication, treatment, and limitations, and justify the finding with specific reasons." *Villano*, 556 F.3d 558 at 562; see also 20 C.F.R. § 404.1529(c); SSR 16-3p. Moreover, an ALJ may not discredit a claimant's testimony about her symptoms "solely because there is no objective medical evidence supporting it." *Villano*, 556 F.3d 558 at 562 *citing* 20 C.F.R. § 404.1529(c)(2); *see Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006) ("[T]he [ALJ] cannot disbelieve [the claimant's] testimony solely because it seems in excess of the objective medical testimony."). Even if a claimant's symptoms are not supported directly by the medical evidence, the ALJ may not ignore circumstantial evidence, medical or lay, which does support the claimant. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539–40 (7th Cir. 2003).

Indeed, SSR 16-3p, and former SSR 96-7p, require the ALJ to "consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007). Thus on remand, the ALJ shall reconsider Claimant's RFC and conduct a symptoms evaluation after a consideration of the whole case record.

## IV. CONCLUSION

For the aforementioned reasons, Claimant's motion for summary judgment is granted and the Commissioner's motion for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this opinion. It is so ordered.

**ENTERED:**

_____
**Michael T. Mason
United States Magistrate Judge**

**Dated: August 3, 2016**